Gerald L. Walker and Mildred McMeans Walker v. Commissioner.
Walker v. Commissioner
Docket No. 50992.
United States Tax Court
T.C. Memo 1957-40; 1957 Tax Ct. Memo LEXIS 212; 16 T.C.M. (CCH) 171; T.C.M. (RIA) 57040; March 12, 1957
*212 Held, petitioner Gerald L. Walker was a bona fide resident of Japan for the entire year 1950, and the insurance commissions which he earned in 1950 under his contract for writing life insurance policies on the lives of American military personnel stationed in Japan, having been earned in Japan, were excludible from his gross income under the provisions of section 116(a)(1), Internal Revenue Code of 1939. Parker C. Fielder, Esq., Box 913, Midland, Tex., for the petitioners. J. H. Felice, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The Commissioner has determined a deficiency in income tax of $7,186.42, and an addition thereto of $1,796.61 for failure to make and file a return, for the taxable year 1950. The petitioners contend: (1) that, except for an amount less than $600, their entire income was excludable from gross income under section 116(a)(1), Internal Revenue Code of 1939, and therefore they were not required to file a return; (2) that if they were required to file a return, the failure to do so was due to reasonable cause rather than willful neglect; and (3) that, if their entire income was taxable and they were required to file a return, they are entitled to a deduction from gross income in the amount of $17,285.96. Findings of Fact Issue 1 The petitioners, Gerald L. Walker (hereinafter referred to as Gerald) and Mildred McMeans Walker (hereinafter referred to as Mildred), are husband and wife and at all times have been citizens of the United States. Gerald and/or Mildred did *214 not file separate income tax returns or a joint income tax return for the year 1950. Gerald was for a number of years engaged in selling life insurance. During the years 1941 through the early part of 1949, Gerald sold life insurance to military personnel at various military installations in the United States. He would remain at the various places for periods of time ranging from a few months to over 2 years. During this period, while Gerald sold insurance at the different military bases, the petitioners lived in apartments, hotels, motels, and for a short time rented a home. During these years they considered Texas to be their home and maintained a mailing address in Luling, Texas. In 1949, Gerald entered into contract negotiations with Hubert G. Foster (hereinafter referred to as Foster), president of the Life Insurance Company of America (hereinafter referred to as the Company), in which Foster represented the Company and American International Underwriters (hereinafter referred to as the Agent). The negotiations concerned a contract under which Gerald was to sell life insurance in Japan to servicemen, members of the Armed Services of the United States, stationed there. In *215 1949, as the result of the negotiations with Foster, Gerald entered into a written contract with the Company and the Agent covering the sale of life insurance, on a commission basis, in the Country of Japan. Under the terms of the contract he was to be a writing agent in Japan. The written contract had no provisions regarding the length of time that Gerald was to stay in Japan and perform under the contract; it provided for termination by either party on 30 days written notice. Before entering into the contract, Foster wanted assurances from Gerald that he would move to Japan and agree to stay for a substantial period of time. Other persons were considered for the position but were unacceptable because they only wanted to stay in Japan for a few months. Gerald gave Foster the requested assurances, although no definite period of time was specified. It was upon Gerald's agreement that he would go to Japan and stay for a substantial length of time and that Mildred would go with him that he was employed under the contract. Gerald stated on his application for passport dated April 21, 1949, that his proposed length of stay abroad was 6 months and that the purpose of the trip was "insurance *216 business." Mildred, in her application for passport dated July 9, 1949, stated as proposed length of stay 60 days and purpose of trip was "visit my husband." The respective statements made by Gerald and Mildred in their applications were made in accordance with the instructions given to them by the State Department officials. They also were told that they would have to secure permission from the authorities in Japan if they decided to stay for a longer period of time. Gerald departed by air from the United States for Japan on May 7, 1949, and arrived in Japan on May 9, 1949. Upon arriving in Japan, Gerald registered with the authorities there as a resident. Mildred did not accompany Gerald at that time because she had not obtained a military permit, which was required. On July 9, 1949, Mildred departed by ship from the United States for Japan and arrived there on July 23, 1949. Upon her arrival she registered with the authorities and secured a permit for an indefinite stay. The petitioners' children, Alice and Jerry, who were 29 and 23 years old respectively, had established separate homes prior to their parents' departure and did not accompany them to Japan. When the petitioners *217 left for Japan they took their clothing and personal effects with them and stored what furniture they had in a warehouse in Texas. Upon arriving in Japan, Gerald was assigned living quarters in Hotel Tokyo, Tokyo, Japan, by the military authorities. He was not free to seek his own accommodations. When Mildred arrived in Japan they were assigned quarters at Hotel Omori, Tokyo, Japan. In November 1949, Gerald and Mildred were given permission and moved to Hotel Tokyo, Tokyo, Japan. They stayed at these hotels on a month-to-month tenancy. After Mildred's arrival in Japan, the petitioner's acquired accessories and furnishings, namely, rugs, draperies, tables, lamps, and things of that nature to make their hotel accommodations homelike. These items were not costly but they cost more than petitioners would have expended for a short stay at a hotel. Gerald purchased an automobile after his arrival in Japan and paid the local automobile tax thereon; he secured a Japanese driver's license as required by local law. He did not believe that he was subject to a Japanese income tax and he never paid such a tax. Gerald was responsible for, and paid, all travel and moving expenses to Japan and *218 was responsible for, and paid, all his living expenses and business expenses; none of such expenses were paid by or reimbursed by the Company. It took Gerald one and one-half to two months to secure the necessary permits in order to sell insurance at the military bases. Gerald and Mildred were satisfied with the climate, the living conditions, and the working conditions in Japan. They made friends with native Japanese, Americans, and other nationalities and visited these friends in their homes and entertained them in their living quarters. Gerald took Japanese language lessons and acquired some skill in the use of the language. He did not join any business or social organizations in Japan. While in Japan, Gerald and Mildred were not permitted to use Army or Armed Force facilities such as post exchanges and sales commissaries. Gerald established a bank account at National City Bank of New York in Tokyo in 1949, having closed his bank accounts in the United States upon his departure. Gerald had his commission checks mailed to him in Tokyo and deposited them to his account in the Tokyo bank. During his stay in Japan, Gerald did not have time to sell at all the bases in Japan. Gerald *219 did not contact all possible purchasers of insurance in Japan; the market was not saturated. He continued to sell insurance all the time he was in Japan and the business was profitable as long as he was there. Gerald and Mildred, in the spring of 1950, decided to return to the United States for business discussions, family visits, and a vacation. Gerald wrote a letter to the Company indicating his intentions. Prior to leaving Japan, he stated to a friend, William L. Sawyer, that he intended to return to Japan. Before leaving Japan, in 1950, Gerald and Mildred secured return visas on their passports and re-entry permits. Gerald purchased, and paid for, a roundtrip ticket by air from Japan to the United States for himself. Gerald purchased, and paid for, a one-way ticket by air from Japan to the United States for Mildred. She was adverse to air travel and preferred to return to Japan by ship. Upon leaving Japan, Gerald stored office supplies that he had on hand at Hotel Tokyo. He sold his automobile purchased in Japan to the persons from whom he had purchased it; he withdrew all of his funds in his bank account in Tokyo. Upon leaving Japan, Gerald and Mildred were required to give *220 up their accommodations at Hotel Tokyo because hotel space was at a premium and under control of the military authorities and the military authorities would not permit them to reserve a room and leave it unoccupied. Gerald and Mildred departed by air from Japan on May 30, 1950, and traveled to the United States. After arriving in the United States, they visited with family and relatives. Gerald also carried on contract negotiations with officials of the Company and the Agent relating to his contract. As a result of the negotiations, Gerald was appointed general agent in charge of the Japan office under a more favorable contract. The new contract for work in Japan was subject to the same conditions relating to going to Japan and remaining there as the original contract, to which Gerald agreed. The negotiations for the new contract were completed about the middle of October 1950. While Gerald was in the United States in 1950, he had dental work done, which dental work was completed by the end of September. About July 4, 1950, while visiting their son Jerry in Austin, Texas, where Jerry was attending school, the petitioners saw a model home for sale. Jerry, being familiar with real *221 estate values, thought that the house was a good buy. The petitioners purchased the house and took their furnishings out of storage and placed them in the house. Jerry and his wife lived in the house from time to time until the latter part of 1951, when they moved in intending to reside there permanently. However, in the spring of 1952, Jerry and his wife moved to Houston. The telephone in the house in Austin was applied for in the name of Jerry's wife, but Jerry and his wife had another telephone at the same time at another place. Gerald and Mildred stayed at the house until their respective returns to Japan. Gerald did not claim a homestead exemption for the house with respect to property taxes. The house was later rented to third parties. Gerald purchased an automobile in June 1950, shortly after his arrival in the United States. The car was used during the visit in the United States. Mildred took the car to Japan when she returned there in 1953. Gerald sold no insurance in the United States in 1950, and attempted to sell none. Gerald opened a bank account in Austin, Texas, in 1950. The account remained open after Gerald returned to Japan. Gerald left the United States by *222 air and went to Hawaii in October 1950. The purpose in going to Hawaii was to train the Agent's agents in Hawaii to sell life insurance and to secure a permit for the agents to sell at military installations. Gerald intended to remain in Hawaii for about one and one-half months. Gerald made no attempt to secure a permit for himself to sell insurance in Hawaii, and made no attempt to sell insurance in Hawaii, and sold no insurance in Hawaii. Gerald's efforts to secure permits for the Agent's agents in Hawaii were unsuccessful. If his efforts had been successful, Gerald would have supervised Hawaiian sales from Japan, and there would have been no necessity for remaining in Hawaii. Gerald received no compensation for any work done in Hawaii. If he had secured the permit he would have received overriding commissions on the insurance sold by the agents. While in Hawaii, Gerald became ill and was hospitalized for a day or two. He decided to return to the United States instead of proceeding to Japan in order to have the care and comfort of his family. His son flew to Hawaii to accompany him to the United States; they departed from Hawaii by air on November 21, 1950. Gerald recovered *223 and departed for Japan on December 15, 1950, and arrived there on December 17, 1950. He stayed at the Hotel Tokyo. Upon arriving in Japan, Gerald entered the country as a semipermanent resident and his passport was so endorsed. He registered as a resident non-Japanese national and secured a "Certificate of Registration of a Non-Japanese National's Residence in Japan," as soon as he was required to do so by the Japanese civil authorities. Gerald worked under his revised contract with the Company and the Agent. Mildred did not accompany Gerald to Japan in December 1950. Her 79-year old sister was ill in Arkansas and she wished to make a trip there to see and care for her. Mildred's sister died a few months later. After her death, Mildred was required to make application for a new military permit to enter Japan since her old one had expired. Her new permit was issued in August 1951, and she prepared to leave for Japan, but she telephoned Gerald on September 4, 1951, and he advised her not to come to Japan as he was ill and might have to travel to the United States. Gerald remained in Japan until December 15, 1951, when he left for the United States. At the time of his departure, *224 he secured a re-entry permit to re-enter Japan. Gerald went to the United States by reason of illness. He intended to remain in the United States a short while and to return to Japan. Gerald and Mildred together returned to Japan in 1953, leaving the United States on January 13, 1953, and arriving in Japan on February 21, 1953. They took their automobile, the one purchased in 1950, to Japan with them. While in Japan from 1953 to 1955, Gerald sold life insurance for Trans-American Life Insurance Company, of which Hubert G. Foster was then president. The conditions of this contract were similar to those of the earlier contract. Gerald and Mildred remained in Japan until December 3, 1955, when they returned to the United States, and have since remained here. In a Department of State application for registration, which was approved March 11, 1953, Gerald stated that his legal residence was at 2802 Perry Lane, Austin, Texas, and that he resided outside the United States, as follows: "1949-50 Japan; Dec. 1950-Dec. 1951 Japan; Feb. 21, 1953-present Japan." Gerald made the same statement under oath in a Department of State passport application which was filed on April 1, 1953. On May 11, 1953, Mildred *225 filed a Department of State passport application on which a passport was issued May 12, 1953, in which she stated under oath that her legal residence was 2802 Perry Lane, Austin, Texas, and that she had resided outside the United States, as follows: Japan from July 23, 1949 to May 30, 1950; Japan from February 21, 1953 to present. Gerald and Mildred were instructed by officials of the State Department with respect to their applications for registration that an address in the United States should be shown for legal residence and that the periods in which they were present in the United States should not be shown. During the years 1949, 1950, and 1951, Gerald sold insurance in Japan under his contract with the Company and the Agent. Gerald had no other business in Japan than selling insurance pursuant to his contract. During the year 1950, Gerald received $31,765.32, which was composed entirely of commissions received from the Company in the amount of $15,465.36 and commissions received from the Agent in the amount of $16,299.96. All of the $16,299.96 commissions received from the Agent during 1950 were earned on policies written by Gerald in Japan. Gerald never sold insurance for *226 the Agent before going to Japan. All were first year commissions; the Agent paid no renewal commissions. Of the $15,465.36 commissions received from the Company during 1950, $14,585.68 was first year commissions earned on policies written by Gerald in Japan and none of which $14,585.68 represented commissions earned on policies written by Gerald in the United States prior to going to Japan. Of the $15,465.36 commissions received from the Company during 1950, $879.68 was renewal commissions of which less than one-fourth ($219.92) was renewal commissions earned on policies written by Gerald in the United States and the balance of the renewal commissions was earned on policies over 1 year old written by Gerald in Japan in 1949. The Company was not, during the years 1949 and 1950, an agency of the United States Government and had no connection with the United States Government, and the Agent was not, during the years 1949 and 1950, an agency of the United States Government and had no connection with the United States Government. Gerald was a bona fide resident of Japan during the entire year 1950. Issue 2 Gerald sought advice of A. W. McIver, a public accountant, of San Antonio, *227 Texas, as to his obligation to file a Federal income tax return for the year 1949, and upon being advised by McIver that he should file a return for 1949, he did so. In 1950, Gerald again consulted McIver regarding his obligation to file an income tax return for the year 1950 and sought his advice. McIver, after some study of the subject matter, advised him that he was not required to file a return for 1950. Gerald relied upon this advice. McIver had been engaged in the practice of accountancy at various times since 1919, and had engaged in the preparation of income tax returns since 1920. McIver had prepared Gerald's income tax returns for the years 1943 through 1949. McIver had had previous experience in regard to the exemption of income of non-residents and was familiar with the law and regulations pertaining thereto. Gerald consulted Paul V. McNutt, legal counsel for the Agent in Japan in May 1949, and again in the spring of 1950, regarding his obligation to file an income tax return for 1950. McNutt was familiar with the facts relating to Gerald's work in Japan and the source of his income and advised that Gerald did not need to file a tax return. Gerald relied upon his *228 advice. Gerald consulted McDermott, an attorney in Tokyo to whom he had been recommended, in 1949, 1950, and 1951. Gerald regarded him as well posted and informed on United States income tax laws. Gerald stated to McDermott the nature of his activities, the periods he had been present in Japan, and the nature of the work he was doing. Gerald was advised by McDermott that he was not required to file a return for 1950 and Gerald relied on that advice. Gerald's failure to file an income tax return for the year 1950 was due to reasonable cause and not to willful neglect. Issue 3 The petitioners paid the following amounts for the following purposes in 1950: 1. Automobile Expense - Japan
$ 646.83
2. Automobile Expense - United
States 1/2 to business
$590.68
295.34
3. Taxi and Car Rental - Japan
96.00
4. Taxi and Car Rental - Hawaii
345.80
5. Salaries Paid
1,066.15
6. Commissions Paid
2,918.00
7. Advertising
106.10
8. Business Entertainment
444.70
9. Telephone
42.86
10. Travel Expense - Japan - Meals
and hotel away from Tokyo
511.20
11. Travel Expense - Hawaii - Meals
and hotel
385.55
12. Travel Expense - United States -
Meals and hotel
207.06
13. Travel Expense - En route Japan
to United States and return -
Meals, hotel and taxi
54.20
14. Travel Expense - Air Transpor-
tation
(a) Japan to United
States
$1,622.28
(b) Austin to Ft.
Worth
50.02
(c) United States to
Hawaii
523.60
(d) Hawaii to United
States
523.60
(e) United States to
Japan
894.13
3,613.63
15. Freight, Express, Packing and
Insurance - Japan to United
States and Return
922.50
16. Miscellaneous
40.55
Total
$11,696.47
*229 In addition to the preceding amounts, which were recorded in his journal at or about the time the expenditure was made, Gerald estimated that he expended an additional $2,500 for commissions paid and $500 for business entertainment. Additional facts relating to the above expenses are as follows: Items 1, 3, and 10 were expended in traveling away from home to various military bases in Japan in pursuit of trade or business. Items 5, 6, 7, 8, and 9 were expended in connection with Gerald's insurance business. Items 4, 11, 14(c), and 14(d) were expended by Gerald in traveling away from home to Hawaii in pursuit of trade or business. Items 2, 12, and 14(b) were expended by Gerald when negotiating a new contract with the Company and the Agent. One-half of item 14(a) was airplane fare for Mildred when she returned to the United States from Japan on May 30, 1950. Items 13, 14(a) (one-half thereof), 14(e), and 15 were expended in traveling and shipping personal effects between Japan and the United States. Opinion Issue 1 BLACK, Judge: The first question for decision is whether Gerald [1] was a bona fide resident of Japan for the entire taxable year 1950 within the intendment *230 of section 116(a)(1) of the 1939 Code. If he was, the other issues, viz., whether the petitioners' failure to file a return was due to reasonable cause and not to willful neglect and whether the petitioners are entitled to certain deductions under section 23(a), Internal Revenue Code of 1939, need not be decided since it is undisputed that the petitioner's entire income, except for an amount less than $600, was earned income from sources without the United States and would be excluded from gross income under section 116. Whether Gerald was a bona fide resident of Japan for the entire taxable year is a question of fact and each case must be determined upon its own facts. See Charles F. Bouldin, 8 T.C. 959. The applicable sections of the Internal Revenue Code of 1939 and of Regulations 111 are printed in the margin. [2]
*231 The legislative history of section 116 of the 1939 Code has been given in several cases by our own Court and by United States Circuit Courts of Appeal and need not be repeated here. In determining whether Gerald was a bona fide resident of Japan during the entire year 1950, we do not have to determine that he was domiciled there. Gerald testified at the hearing and made it clear that he did not at any time intend to change his domicile from the United States to Japan. But it is not domicile which we have to determine. The issue which we have to decide is whether Gerald was a bona fide resident of Japan during the entire taxable year 1950. The difference between domicile and residence, as residence was contemplated by section 116(a)(1) of the 1939 Code, was clearly pointed out by the court in Swenson v. Thomas, 164 Fed. (2d) 783. The court in that case, among other things, said: "We think there can be no doubt that his continuous and unbroken living there for four years was 'residence.' He did not change his citizenship, nor does the law contemplate that. The exemption was expressly made for citizens of the United States. The law says nothing of domicile, or changing *232 that. Domicile is not changed by foreign residence so long as there is an intention to return home. * * *" The Court, in the Swenson case, supra, discussed the meaning of the same regulations as we have printed in the margin. In discussing the meaning and application of the regulations to the facts in the Swenson case, the court said: "The Regulation above referred to makes no difficulty. It excludes 'a mere transient or sojourner's and correctly. A transient means literally 'one going across', or passing through. 'Sojourner' is built around the French word 'jour', meaning a day, and signifies a mere temporary presence or visit. The Regulation continues: 'A mere fleeting intention indefinite as to time, to return to another country is not sufficient to constitute him a transient. If he lives in the United States (or Colombia) and has no definite intention as to his stay he is a resident. One who comes to the United States (or Colombia) for a definite purpose which in its nature may be promptly accomplished he is a transient; but if his purpose is of such a nature that an extended stay may be necessary for its accomplishment, and to that end the alien makes his home temporarily *233 in the United States (or Colombia) he becomes a resident, though it be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated or abandoned.' Under this elaborate explanation Swenson was a resident in Colombia, for his business was likely to require 'an extended stay' and did take four years. Making his 'home temporarily' in Colombia does not mean necessarily buying a house or changing his domicile. It means no more than living there temporarily, though his business requires him to move from place to place. Whether tested by the Regulation or the simple words of the statute, no fair conclusion can be reached but that Swenson's presence in Colombia, making his living there and paying his taxes there for several years continously, was bona fide residence." We think, tested by the foregoing interpretation of the court in the Swenson case, supra, that Gerald was a resident of Japan during the entire taxable year 1950. It is true, there are some differences in the facts of the instant case from those of the Swenson case. These differences, however, we do not think are sufficient to cause us to reach a different result from that *234 which the Fifth Circuit thought was proper to reach in the Swenson case. It seems clear to us, after careful consideration of all the facts, that when Gerald went to Japan in 1949 for an extended stay he intended to establish a residence there within the intendment of section 116(a)(1) of the 1939 Code. It is true, of course, that Gerald's income from writing insurance in Japan during 1949 was not excludible from his gross income under section 116(a)(1). That was because he was not a resident of Japan for the full 12 months of 1949. Petitioners claim no exclusion from gross income for 1949 and in that year they filed a Federal income tax return and we have no issue before us as to that year. But the situation is different as to 1950. If Gerald established a residence in Japan in 1949, as we think he did, then that residence continued throughout 1950, unless it was abandoned when Gerald and Mildred returned to the United States May 30, 1950, for a vacation with their two children, both of whom were married, and for the further purpose of a conference by Gerald with his employers with the view of improving his position in carrying on his work of writing life insurance in Japan. We *235 have carefully examined and considered the evidence with respect to Gerald's and Mildred's return to the United States in 1950, and we do not believe that it sustains respondent's alternative contention that even though we should find that Gerald established a residence in Japan in 1949, nevertheless he abandoned it in May 1950, when he and Mildred returned to the United States. Manifestly, if respondent's alternative contention is established by the evidence, then his determination that Gerald was not a resident of Japan for the entire year 1950 was correct. We think, however, that petitioner has borne his burden of proof to show that in 1949 he established a bona fide residence in Japan and that that residence was not abandoned when he and Mildred departed for the United States in May 1950, nor was it abandoned during any other period of the year. We do not think it is necessary to discuss all the evidence on this point. It is doubtless true, as respondent argues in his brief, that some of the evidence supports respondent's alternative contention. However, in our opinion, the evidence, when considered as a whole, supports petitioners and we so hold. Cf. White v. Hofferbert, 88 Fed. Supp. 457. *236 In the White case, Judge Chestnut, in reaching the conclusion that "It is very plain that Mr. White was not merely a transient or sojourner in either Sweden or Spain," relied heavily upon Swenson v. Thomas, supra. We think that much of Judge Chestnut's discussion in the White case would be applicable to the facts in the instant case. We reverse the Commissioner's determination that petitioners were not bona fide residents of Japan during the entire taxable year 1950. As to this issue we sustain the petitioners. Having decided this issue in favor of the petitioners, it becomes unnecessary to discuss or decide the issues which petitioners press in the alternative. Decision will be entered for the petitioners. Footnotes
1. We need not consider whether Gerald's wife, Mildred, the other petitioner, was a bona fide resident during 1950 since the income in question was earned by Gerald.↩
2. Internal Revenue Code of 1939. SEC. 116. EXCLUSIONS FROM GROSS INCOME. * * *
(a) Earned Income From Sources Without the United States. - (1) Bona fide resident of foreign country. - In the case of an individual citizen of the United States, who establishes to the satisfaction of the Secretary that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) if such amounts constitute earned income (as defined in paragraph (3)) attributable to such period; but such individual shall not be allowed as a deduction from his gross income any deductions properly allocable to or chargeable against amounts excluded from gross income under this paragraph. Regulations 111. (As amended by T.D. 6039, 1953-2 C.B. 162.) Sec. 29.116-1. Earned Income From Sources Without the United States. - (a) Resident of a foreign country. - For taxable years beginning after December 31, 1942, and before January 1, 1951, there is excluded from gross income earned income in the case of an individual citizen of the United States provided the following conditions are met by the taxpayer claiming such exclusion from his gross income: (a) It is established to the satisfaction of the Commissioner that the taxpayer has been a bona fide resident of a foreign country or countries throughout the entire taxable year: (b) such income is from sources without the United States: (c) such income would constitute earned income as defined in section 25(a) if received from sources within the United States for taxable years beginning before January 1, 1944, or as defined in section 116(a)(3) for taxable years beginning after December 31, 1943; and (d) such income does not represent amounts paid by the United States or any agency or instrumentality thereof. Hence, a citizen of the United States taking up residence without the United States in the course of the taxable year is not entitled to such exemption for such taxable year. * * * Whether the individual citizen of the United States is a bona fide resident of a foreign country shall be determined by the application, to the extent feasible, of the principles of sections 29.211-2, 29.211.3, 29.211-4, and 29.211-5, relating to what constitutes residence or nonresidence, as the case may be, in the United States in the case of an alien individual. Sec. 29.211-2. * * *
An alien actually present in the United States who is not a mere transient or sojourner is a resident of the United States for purposes of the income tax. Whether he is a transient is determined by his intentions with regard to the length and nature of his stay. A mere floating intention, indefinite as to time, to return to another country is not sufficient to constitute him a transient. If he lives in the United States and has no definite intention as to his stay he is a resident. One who comes to the United States for a definite purpose which in its nature may be promptly accomplished is a transient; but if his purpose is of such a nature that an extended stay may be necessary for its accomplishment, and to that end the alien makes his home temporarily in the United States, he becomes a resident, though it may be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated or abandoned. An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States within the meaning of this section, in the absence of exceptional circumstances.↩